You may come on up. Good morning. May it please the Court. The jury in this case found that the defendants had fraudulently concealed a release of all to the primary competitor, Convitec, in order to induce my client Hollister to pay $35 million for the very patent rights that they had secretly released. The jury also found that my client Hollister had been injured by that fraudulent concealment. So the issue in this appeal is whether it was error for the District Court to allow the parties which have perpetrated the fraud to escape from any liability for their conduct by awarding no damages to my client. The interplay between the Florida law and the patent law in this case is unique. But in both cases, the law prohibits an award of zero on this record. And it's a unique case because you have a fraud case. You have a Florida fraud case in which the law or the case involved patent rights. And so you have Florida law dealing with the quantification of damages in a fraud case applying and you also have patent law dealing with what is a reasonable royalty in a patent infringement case that is implicated. Each, and certainly in tandem and separately, would require an award on this record of something other than zero in damages. And let's start with Florida law. Florida law, as articulated by this court, provides that once you have liability and injury established in a fraud case, that a wrongdoer cannot escape liability simply because the harm he caused is difficult to quantify. And there are four guidelines that Florida law has established and have been recognized by this court. The first is the proof of the amount of damage is less severe than the burden of proving the fact of damage. Second point would be that a just and reasonable estimate of the amount of damages is all that is required under Florida law. Third, that the determination can be based upon probable as well as inferential proof and doesn't have to be direct and positive proof. And then the fourth point being that under Florida law for quantification of fraud damages, mathematical precision is not required. So those four guidelines support the overarching principle that it is unjust and in fact unbearable to allow defendants to profit by their own wrongdoing at the expense of the victim, which is what has happened in this case. Now, interwoven with this Florida law standard on the quantification of fraud damages is the law of patent infringement, which requires an award of a reasonable royalty from an infringer. And I think we understand what the law is and that the measure of damages is really measured by the patent law because we've got to determine what you had to prove is number one, that there was an infringement, and then number two, what you would have gotten in the infringement suit if you hadn't been barred by that release. Let me just tell you what my concern is. I, of course, ask these questions to your opponent primarily, but it seems to me probable that the district court has erred in affording minimum appropriate weight to that barred settlement because your expert didn't know much, which was not real good on your part, but the fact that he didn't know much does not seem to me to be real significant because we do know that we had precisely the same patents. We had an infringing object barred, which had to be pretty much the same as context product because there were only three in the market and they were doing the same thing and so forth. The one thing that bothers me and the one thing the district court said at 33 and 34 note 29 was that in the barred settlement, in fact, this is the only thing that seems to me to be questionable about the barred settlement, is that it did, in fact, include not only the 583 patent, which was infringed, that's what you proved, but the 627 patent and foreign patents. The district court didn't mention 627. He mentioned only the foreign patents. He called them the foreign counterpart patents so that under the PRISM case that you're probably familiar with in the Federal Circuit, it does say that if there are unrelated patents, which are part of the previous license, like barred is a previous license to which we're comparing here, if unrelated patents were included in that, then you've got to allocate the value. You did not allocate any value to the 627 or the foreign counterparts. I know that the defendant never argued anything about the 627 patent in the district court and the district court didn't mention it either, but the district court did mention and the defendant did argue about the foreign counterparts. Why should we not allocate some value in the barred settlement to the foreign counterparts? I believe that that is a legitimate argument in, if you will, mitigation of the position that we took. Of course, it was not argued in the district court to address the PRISM standard and I think the court used the important word, if the license included unrelated patents. In this case, the 627 was in fact the earlier patent and a parent of the 583. The effectively had minor variations in the claim language but dealt with the same technology. The reality being that if you're getting, in this case, a license under the 583, there was really no enhanced value to the recipient for the 627. On the foreign patent rights, I believe that the GHX data that was put into evidence dealt with domestic sales of the products only, but I can't really address the foreign patents beyond that statement because I don't think there's anything else in the record that would allow us to do so. Where I come back to is where I started, Judge Anderson. We have a patent that is clearly a comparable patent. One that is honestly, you don't, in patent cases, get something this good. You just don't. You usually have to come in with a bunch of third party licenses for different patents in different marketplaces and try to argue by analogy that they're pretty close. Here you have dead on comparable patent issued to the only other competitor after dealing with the same product, same marketplace, at the same time resulting from a litigation started the same day in the same court as the sabotaged Convitec litigation. You don't get anything better than that. And could there be an argument that the value that was received by Bard is at $6.65 million, perhaps more than what it would have been if you're only focusing on the 583? That may be an argument. It was not made. It would be one, I suppose, that could be fielded if you have a remand, which I think the company, your defendant, your opponent, did not make that argument in the district court. I've read enough. I don't think he made that argument with respect to the 627, but I thought he did make that argument with respect to the foreign counterparts. I know that there was an argument that it was not a comparable license based on the as explained by the witness, Mr. Gennett, common. You settle the whole shooting match. You don't push a little bit out here. In other words, no licensee would ever license the 583 without also licensing the 627 and the foreign patent. And if it intended at all to go foreign, it would need the foreign licenses. Absolutely, and there you are with the conundrum. Any comparable license you're going to bring in is going to have that element. Could they argue that there should be some adjustment? They could. They did not. And in fact, all they did was, if you will, bootstrap on the court's observation that there were foreign patent rights involved in the license at issue, which the court . . . The district court in that footnote I mentioned said something to the effect that in the infringement suit, you would not have been able to collect with respect to foreign . . . any infringement of foreign patents because it would be extraterritorial. But that doesn't seem right to me. I mean, they've got . . . the district court would have jurisdiction of the defendant. If the foreign patents were infringed, I don't see why the defendant could not be held accountable for that. It is possible. It's make user sell, as the court knows, is the standard. And if the product was made in the United States or sold from the United States, there would be rights infringed in the United States. However, if it was made overseas, sold overseas, and used overseas, you might have an extraterritorial issue that you would have to adjudicate in that foreign nation if there were patent rights in that foreign nation. Do we know whether Bard . . . Bard got not only the 627, but he also got the foreign . . . or they, Bard, also got the foreign counterparts, I think, didn't he? Correct, Your Honor. And it . . . what you call it, a whole piece, it bought a full world piece. Something we don't see very often. I have a different line of inquiry, Mr. Jake, so I'm going to keep you up there for a few minutes and I'll still give you your full time for rebuttal. As I understand your claim, you're seeking benefit of the bargain damages under Florida law as measured by the patent law concept of a reasonable royalty. Is that correct? I think that's the best way to characterize it. Okay. Florida courts have said that to prove benefit of the bargain damages, the plaintiff is required to prove the actual value of the property at the time of the purchase. Isn't that right? I believe that is a correct statement from the case law that you're looking at, yes. Where is the evidence in the record of the actual value of the assets transferred at the time of the transaction? The only evidence would be, I believe, testimonial evidence regarding a quantification for tax purposes of the value of the assets, referred to as the Houlihan-Loki calculation, and I think they, for tax purposes, put it at $8.7 million, but the court is correct. By definition, you cannot infringe nor enforce a patent until it's issued. Since at the time, the asset that was bought were these incoate pending patent applications, you could not do anything with them, and of course, the reality being, as we know from the case, when we got our patent and sued our competitors, we were able to secure protection of our rights with BARD, but not with Convitec because of the fraud. My concern is not about quantification of the damages of it, it's about the timing. As I understand it, your evidence reflects what Convitec would have paid for a license in 2010, but that doesn't tell us anything about the value of the property, assuming what Hollister said was correct, as he said was correct when the transaction occurred in 2006. The only other thing in the record that I could point, Your Honor, to Judge Pryor is the fact that when they gave the concealed release to Convitec a year earlier, or a year and a half earlier, they received $5.9 million for that release, but that, of course, was before any patent rights had issued, which we ultimately prosecuted. You want more than that, but it seems to me that that's the closest in time good evaluation, the $5.9 million, because it was in October 2005. The settlement they paid October 2005, Convitec paid the $5.9 million, somewhat of arguably value of what they had misappropriated or taken or fringed or what have you, or inversely, the reasonable royalties they should have paid to get the license from you that they didn't get. Of course, you didn't have the patent then, but still, you could license your technology without a patent. We'll release it, as we know. Right. Then when was the purchase in 2006 for $35 million? I apologize. I believe it was July-ish. Because the release was October 2005, so that's just six months. I don't know if I'd been trying this case. It looks like that $5.9 is the closest approximation of what the damages were. Not disclosing the agreement, it seems like the release agreement, what they got paid for for the lease agreement, has some nexus as to the reasonable royalties. Why would that not be the best measure of damages? Well, Your Honor, we approached the case, two answers to this, but we approached the case looking at a but-for kind of a concept. I understand you asked for a lot more. That's why I think you got off track. Well, I understand, but it was from a but-for. It was but-for the fraud. We would have had the patent. We would have been able to enforce it. It was valid, and it would have had that value. But isn't a reasonable interpretation, but for the fraud, you would have known about the release. You still would have gone through with the deal and said, we want the $5.9. So that's a possibility. And the second answer to the question is, in post-judgment proceedings, we did make that alternative argument that the $5.9 was an alternative measure. I looked at your complaint. You actually said in your complaint that that's kind of what you wanted, that I hope you want it more later on. I have to go back to the complaint. Your Honor, I believe it. You said they didn't disclose the release, and let's see, you learned of the settlement. After the fact, this is part of your fraud, and you say, as a result of the breach of that money. Your Honor, I'm sure we referenced the $5.9 million. Yeah, you say, as a result of the material fraudulent misrepresentations in paragraph 57, Hollister has been damaged in an amount equal to the amount Hollister would have recovered from Convitec in the Convitec lawsuit if it not had the release. Well, to some extent, the $5.9 is kind of what that would be, I guess. It is certainly an alternative that we presented to the court post-judgment, and it was rejected. Well, it was in paragraph 57 in your complaint. True. Yes. Thank you. Thank you, Your Honor. Thank you. Your Honor, may it please the court, counsel. My name is Taylor Wayne Casey, and I represent Appellee Peter Von Dyke in this matter. This case is about whether or not the district court erred by ruling that the applicable law in this case on the damages was patent infringement law to accomplish what the benefit of the bargain would be under either a breach of contract claim, theory for damages, or And whether or not that law requires some award even when there is evidence lacking in a record or a record lacking evidence that meets the burden of persuasion, persuading the jury that the plaintiff in this case has established a reasonable royalty amount of damages and fails to support any intermediate number that may not be the number advanced by the plaintiff but may be somewhere between zero and what was advanced by the plaintiff. Your Honors, I would submit that the district court got it right on the unique factual circumstances in this particular case. I don't believe that opposing counsel and I disagreed as to what the patent infringement law required. The law does indicate, as noted in Appell, both of us cited to that case, if you were to look at the oral argument and the filings that we made on the motion to alter or amend the judgment, we both pointed to Appell as the case to look at. Opposing counsel pointed to that case arguing that Appell teaches that you had to award some amount of damages that you couldn't award zero damages. I pointed out to the district court in our arguments on that that Appell does not teach that in every circumstance that there could not be a zero damage award and in fact that there was a footnote indicating that . . . . . . Let me stop you for a minute. Yes, sir. My understanding of your argument in the district court and on appeal is not that the damages should be what Judge Pryor had suggested, namely under the Florida law and measured as of how much less the buyer would have paid at the time of the $35 million purchase, but rather I thought the case was litigated and everybody agreed that the damages would be the infringement damages that the buyer here, Hollister, would have gotten from Convitec had it not been barred by that release. Wasn't that the way the case was litigated? Yes, Your Honor. That was the primary focus at least of the damages phase of the trial that I was responsible for was focused more on that second prong that you pointed out, what would have been the damages proven at Convitec. However, there was argument made by my client that we raised in cross-examination, I believe of Mr. Gennett, and unfortunately it was not as precise as I wish it would have been had I had a chance to retry this case. One of the lines of questioning to Mr. Gennett went to whether or not there was ever a suit filed by Hollister pursuing claims under the 627 patent, and this played back into that at the time of the asset purchase agreement when Hollister purchased these patent applications in 2006. It was actually in September, I would point out, September 5th of 2006. The application that then issued as the 627 patent issued as a patent in December of 2006, shortly after the purchase. That was never sued on, and the reason that was never sued on is because Convitec's product did not infringe the claims of the 627. The 627 patent that issued, which is in evidence, I believe it's either 53, should be exhibit, plaintiff's exhibit 53, shows that the claims within that particular patent required three distinct sections within the rectal catheter. Those distinct sections also required varying durometer hardness. Now, this is something that I attacked in the infringement arguments under the 583 as well, and the court rejected that approach and that attack, saying that the 583, which was also a pending patent at the time of purchase, had been amended and altered, language had been changed after the purchase and by Hollister that broadened the claim language. What they did was they took out the requirements of varying durometer hardness, and it expanded the scope and coverage of the patent claims in the 583, and that's why they pursued that litigation once the 583 issued in May of 2010 and could not pursue, successfully pursue litigation against Convitec, at least under the 627. The expert, Jeanette, did testify that the 627 had been infringed also, did he not? I believe there was tangentially that he indicated he believed that it could have been, he believed that he could have pursued that or his client could have pursued that. In any event, it seems to me, just as a matter of common sense, that any licensee would want and would not license just the 583 patent, any licensee would insist upon licensing the entire related family of patents, would it not? Your Honor, I would say that it would appear that way at first glance, however, a careful analysis of two different stages of these, of I guess the background history, will flush out why that's not necessarily the case in this circumstance. If you'll take a look at what was going on in 05, when the 5.9 settlement was reached between Convitec and Zossi, Convitec had provided funding to allow Zossi to engage in R&D development of two lines of product, COP, which was Continostomy port bags, if somebody is incontinent here, and then BMS, which is the bowel management system this case is subject to. At that time, when that settlement was entered, and the reason that the 5.9 is not a reasonable measure is that settlement included two things. Convitec designed around and had firsthand view of how Zossi was building its BMS. Zossi approached a Cadillac of BMSs, highly engineered process, three distinct sections to serve three distinct value propositions in the market. Convitec designed around that by not having three distinct sections, but a simple, what one person referred to as a diarrhea tube, excuse my language, but it was just a garden hose with a retention cuff. It was much simpler. At the time in 05, when Zossi boxed them into that, the agreement, if you recall, per the record, required that they were releasing claims for patent infringement, but only as to that product, the FMS that Convitec had as of 05. Zossi perceived that they were boxing Convitec into an inferior product early on in the stage of development in this product market. Fast forward that to 2010, what ended up playing out after the purchase of these patent applications is that, in essence, it was over-engineered, and when I say it, Zossi's Cadillac of a BMS was over-engineered, and people dealing with emergency trauma did not want all the bells and whistles. I'm going to ask you this. It seems to me maybe we don't need to get into whether or not the proper measure of the infringement damages that the case was litigated on are the proper measure, or even whether the borrowed settlement needs to be adjusted and allocated for perhaps the 627 and the foreign counterparts, because don't we have to remand anyway, because the district court granted zero damages, which is just inconsistent with the Federal Circuit law when you've got something like the borrowed settlement, which is so close and so comparable, and obviously the value is not zero, the 6.65 million of borrowed settlement perhaps needs to be adjusted somewhat, but obviously there is damage here, and once you know it's infringed, the law is very clear that the fact of damage is established, and there's a presumption that there will be damages, and only in a rare situation of absolute failure of proof and an indication that the damages are zero, in fact, should a court find zero damages. Is that not the Federal Circuit law? Your Honor, I would respectfully disagree with that being the exact Federal Circuit law. I believe that the Federal Circuit law provides either of those instances, so I would think that my reading of Apple and the footnotes and the cases that have cited that were that there are three circumstances in which a court would be justified and allowed to award a zero damages award, and all three of these circumstances would be rare. They would not occur very frequently, and that's the reason we don't have replete references in case law to that, because it should be a very rare circumstance. One, the most rare, which would most likely not occur, and we're not arguing happened here, is that you have a patent that in essence is infringed but has no value to it. That's most likely not going to happen because patents are dealing with novel issues, right? So usually they have some value to them. So that's not what we're arguing what happened here. The other issues that you would have are two other issues. You have a failure in your evidence that you submit by accident or overlooking that evidence and what its propositions are, or you have a strategic decision to present evidence that provides an all or nothing approach, and that is what we have here. In this particular circumstance, there were strategical decisions made by opposing counsel to present a large quantification. It was a simple, straightforward, this is the mathematical approach for it. It may have been geared towards a jury, and then we both stipulated to waiving jury and going forward with a bench. It may have been an oversight in why barred settlement is not a fundamental foundation for your extrapolation and starting point. But in any event, is it not true, though, that barred settlement is very clearly at the starting point? Your Honor, I believe that if you were to have more context to it, and I believe the court addressed this and we argued it during trial, brought it out in cross-examination and in post-trial motions, if you had called appropriate witnesses, which were not witnesses and evidence that my client had in his possession, but that plaintiff's counsel and plaintiff had access to their own corporate representatives, their own records, their parties that dealt with barred and negotiating, they had every ability to call those parties and present evidence as to what occurred in that settlement discussion that led up to the barred settlement. Why is that relevant? We know the same patents are at issue. The products are similar. The infringement allegations against barred and convitec, they are almost identical. Your Honor, I believe that there was actually no evidence presented of what the barred product was. There was none induced at trial to reconcile not only the litigation, the procedural posture of where it was, which was quite different in how they pursued it. I did bring it up in my cross-examination that there was an aggressive approach towards barred. Barred was a later entry to this market, had just started, had seen a substantial uptick early by undercutting prices, and was in a different position than convitec was. Again, barred entered the market around 2009. Convitec had been in the market since 2004, predating the asset purchase agreement. And so there were situational differences in their ability to approach and fight litigation. There were also counterclaims raised by convitec that were completely different and subjected exposure to Hollister that were not raised in the other sellers. We know they are insignificant. Well, actually, Your Honor, not just the value of that. There were some issues with submitting that on the confidentiality of it. But to cut straight to the chase, they removed all marking. It was false marking claims that the patents weren't being practiced on the products by Hollister. And what that essentially did, they had to remove claims within all their marketing. They had to remove all patent marketing and recall the prior marked articles. Now, if you're familiar with patent law, if you don't mark the article, it eliminates your ability to move forward with patent infringement claims against any other competitor. Now, that doesn't affect you with convitec or barred, if those are the only two that remain. But if a third competitor or a fourth competitor comes in the market, Hollister could not pursue them unless they proactively sent some notice because they had not marked their products any longer with these patents. And so what that did was that prevented them from pursuing any other parties for patent infringement claims under these patents and these products going forward. So it wasn't just a $250,000 hit. It was a huge hit in marketing materials and a huge hit on marking and your ability to enforce that against other competitors later on, Your Honor. And these are all things that are appearing, if you look at it on the surface, barred settlement appears to be a good starting point. And it seems identical if you just brush over it. But if you get into the detail, there were arguments made that the patents at issue there are different. The 583, the 627 are different. And I think if you get into my cross-examination with Mr. Jeanette, you'll see that I referenced a pizza box example. I apologize for its elementary nature, but I started with three pizza boxes. If you wanted to reconcile the price per slice or value per slice, you had to back out domestic, the box of pizza that was related to domestic patents. And then you would have to work through the slices as to what domestic patents were at issue, 627, 583, or any prior or later patents that may have been issued that factored into that value of the barred settlement agreement. And I apologize. I've gone over my time, Your Honor. Judge Anderson, I think, made the correct point. The Federal Circuit has said that when dealing with a reasonable royalty, you reverse it if it's outrageously excessive or it's outrageously insufficient. And in either case, it would not be a reasonable estimation of a reasonable royalty. Zero is, by definition, outrageously insufficient. You don't get a lower number than zero. If you look at Apple, Apple actually only talks about one situation that it could think of where maybe, hypothetically, a zero award would be acceptable. And that would be where... The theory that the damages would be measured by the infringement damages that Hollister would have gotten from Convotec had it not been barred? Yes. And... What about his argument that you made a strategic choice to present an all-or-nothing settlement case? Was it a strategic choice? Of course, it was a strategic choice. It doesn't change the governing law of the Federal Circuit, which is even if we adduce nothing, nothing at all, the court is still, or the fact finder is still obliged to look at the record and determine from that record what reasonable estimation... I'm referring, the district court made reference to a Hobson's Choice that he felt like he was presented with. And he cited Docket 187, as I recall, and he cited something that you said, and you did use the word Hobson's Choice, but you said that it was the other party who had presented this Hobson's Choice by its decision not to deduce any evidence at all. We were in a strategic position where we put forward what we felt was our best case. Typically, in a damaged case, you get people attacking that number. We had no alternative numbers presented. Even if the court determined that our strategic choice of our best number was not the right number, it had, as we already know, the 6.65 without a multiplier for the Bard, or you had the 5.9 for the Convitex settlement from the get-go as alternative benchmarks. So the point is, and this law is quite clear in the Federal Circuit, most recently in the Info Hold case, which is cited throughout the briefs, that it doesn't matter whether somebody has adduced the evidence to support their position or that the position is incorrect. You still have to find that reasonable royalty. It is present in this record in spades. There are just too many factual guide points. Thank you. Let me ask one more question. How do you propose, if we do remand, because the district court made some errors, how do you propose to the district court as to how to allocate the 6.65 million? What value to place on the 627 and the foreign counterparts, or whether even any value to place on it? Aren't you going to be in the position that you either got to rely upon the discretion of the district court to give you, to let you reopen the evidence? The only way you would get additional evidence regarding the significance of foreign patent rights or the 627 would be to reopen. I don't believe there will be anything in the existing record on which you could mathematically determine that. Is that a ground on which we should affirm? No. In fact, it's to the opposite. Even if the difficulty in getting to the reasonable royalty or the reasonable damages for the fraud is present because of the nature of the fraud, you still, under the patent law or the federal or the Florida law, got to a reasonable estimation. Reasonable estimation doesn't have to be mathematically precise. It would be incumbent upon the judge, if he keeps the record closed, to look at the 6.65 million and say, well, what do I attribute to foreign patent rights or 627, and make a reasonable estimate based on that. Certainly, he could reopen as well. Thank you. Court will be in recess until 9 a.m. tomorrow morning.